IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FAUSTINO MARTIN RAMIREZ,

    Petitioner,

    v.                                                                                                        No. 2:26-cv-00063-SMD-GJF

KRISTI NOEM, *et. al.*,

    Respondents.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

THIS MATTER is before the Court on Petitioner's Verified Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Motion for a Temporary Restraining Order. Doc. 1 ("Petition"); Doc. 2 ("Mot. for TRO"). The Court has reviewed the parties' submissions, the record, and the relevant law, and for the reasons set forth below, the Petition is **GRANTED**. Consequently, Petitioner's Motion for Temporary Restraining Order is **DENIED AS MOOT**.

### BACKGROUND

In 2019, Petitioner Faustino Martin Ramirez arrived in the United States from Guatemala as an unaccompanied minor. Doc. 1 ¶ 67. Petitioner was then released from the custody of the Office of Refugee Resettlement to a sponsor. *Id.* Since his release, he has resided in Shelton, Washington, where he is employed as a salal farmer. Doc. 2 at 5. Petitioner has been legally authorized to work since June 13, 2025. *See* Doc. 1-3 at 18.

On October 8, 2025, at approximately 6 a.m., Petitioner was traveling in a work van near Shelton. Doc. 2 at 5. Petitioner's uncle, Julio Matias Pablo—a lawful permanent resident card holder—was driving the van. *Id.* According to the Petitioner, several vehicles suddenly boxed-in the van from all sides to effectuate a stop. *Id.* The vehicles that blocked the van appeared to be

unmarked. *Id*. Agents wearing black vests with "POLICE" written on them approached the van after the stop. *Id*. The agents inspected the uncle's identification and allowed him to stay in the van. *Id*. at 5–6. They then removed Petitioner from the vehicle, placed him in handcuffs, and moved him to one of their cars. *Id*. at 6. Petitioner alleges that the agents never identified themselves, explained the basis for the arrest, or produced a warrant. *Id*. Following the arrest, Immigration and Customs Enforcement ("ICE") transferred Petitioner from the Northwest ICE Processing Center in Tacoma, Washington, to the Otero County Processing Center in New Mexico. Doc. 1 ¶ 9. On November 20 and December 3, 2025, an immigration judge in Otero denied Petitioner's requests for bond, citing a lack of jurisdiction under the mandatory detention provisions of 8 U.S.C. § 1225(b)(2)(A). *Id*. Petitioner now seeks a Writ of Habeas Corpus from this Court. Petitioner requests his immediate release and an order prohibiting re-detention without notice and a pre-deprivation hearing to satisfy the requirements of Due Process. Doc. 1 at 31.

## DISCUSSION

### I. The Court Has Jurisdiction Over Petitioner's Petition.

As an initial matter, the Court has jurisdiction over Petitioner's habeas petition. The jurisdiction-stripping provisions of the Immigration and Nationality Act ("INA") do not bar this Court's review. Sections 1252(a)(5) and 1252(b)(9) apply only to claims seeking judicial review of final orders of removal. *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007). Here, Petitioner challenges the legality of his detention rather than seeking judicial review of an order of removal. As the Supreme Court affirmed in *Zadvydas v. Davis*, the federal habeas statute remains an available remedy for challenging the legality of detention where Congress has not explicitly stripped the courts of such jurisdiction. 533 U.S. 678, 687–88 (2001).

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." The Supreme Court has limited this bar to these "three discrete actions" and has explicitly rejected interpretations that would encompass the "universe of deportation claims." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). The Court has specifically rejected any reading of § 1252(g) that would sweep in the "universe of deportation claims," *id.*, and has cautioned against an "uncritical literalism" that would bar review of all claims technically "arising from" those three actions. *Jennings v. Rodriguez*, 583 U.S. 281, 293–95 (2018).

**II.     Section 1226(a) Governs Petitioner's Detention.**

    a.  <u>Statutory Framework: 8 U.S.C §§ 1225 and 1226</u>

Sections 1225 and 1226 govern the detention of noncitizens prior to a final order of removal. *See Jennings*, 583 U.S. at 287–89. Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States"—i.e., "applicants for admission." *Id*. at 297. Detention pursuant to § 1225(b)(2)(A) is required "if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted." Noncitizens detained pursuant to § 1225(b)(2) cannot be released on bond.

Section 1226(a) sets the "default rule" for detaining noncitizens "already present in the United States." *Jennings*, 583 U.S. at 303. Under § 1226(a), a noncitizen "may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States." Noncitizens detained pursuant to § 1226(a) are therefore generally entitled to individualized bond hearings. *See id.* at 306.

3

Sections 1225(b)(2)(A) and 1226(a) are mutually exclusive in that both provisions cannot simultaneously govern Petitioner's detention. *E.g., Romero v. Hyde*, 795 F. Supp. 3d 271, 286 (D. Mass. 2025); *see also, Patel v. Crowley*, No. 25-cv-11180, 2025 WL 2996787, at *5 (N.D. Ill. Oct. 24, 2025); *Artiga v. Genalo*, No. 25-cv-5208, 2025 WL 2829434, at *4 (E.D.N.Y. Oct. 5, 2025).

Petitioner challenges his detention under § 1225(b)(2)(A) as inconsistent with the plain language of the INA. Doc. 1 ¶ 116. Instead, Petitioner asserts his right to a bond hearing under § 1226(a), noting his membership in the bond-eligible class established in *Maldonado Bautista v. Santacruz. Id.* ¶ 121.

    b. <u>New Interpretation of § 1225</u>

The recent surge in immigration-related habeas petitions stems largely from a July 8, 2025 policy shift by the Department of Homeland Security ("DHS"). *See* Doc. 1 ¶ 58. In a notice titled "Interim Guidance Regarding Detention Authority for Applicants for Admission," the agency deviated from decades of established practice by recategorizing virtually all noncitizens present in the country who initially entered without inspection as "applicants for admission" subject to a mandatory detention under § 1225(b). *Id.* ¶ 66. As a result of this policy shift, six years after Petitioner's initial entry and subsequent government-authorized release, he was apprehended and subjected to mandatory detention. *Id.* ¶ 67. The detention in this case is particularly dubious from a constitutional standpoint. *See Garcia Domingo v. Castro*, No. 25-cv-00979, 2025 WL 2941217, at *3 (D.N.M. Oct. 15, 2025). Although Petitioner initially entered without inspection, the government nevertheless released him as an unaccompanied minor and issued him work authorization just months before the current arrest. These official actions effectively recognized Petitioner's right to live and work in this country, which significantly heightens the constitutional stakes of a due process deprivation. Furthermore, Petitioner's classification under § 1225(b) bars

4

him from seeking a bond hearing before an immigration judge, as demonstrated by the two jurisdictional denials of his bond requests in immigration court. *Id*. ¶ 77.

Section 1225(b)(2)(A) provides:

Subject to subparagraphs (B) and (C), in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title [Section 240].

(emphasis added).

Since the 1996 enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), DHS has treated noncitizens who entered without inspection and were later apprehended in the interior as subject to discretionary detention under § 1226(a), rather than mandatory detention under § 1225(b)(2). Doc. 15 at 9–10. This means that until 2025, DHS interpreted § 1225(b)(2) to cover only those noncitizens who arrive at a designated port of entry or are apprehended near the border. *Id*. at 10. These are individuals who, in other words, just arrived in the United States. By contrast, DHS historically detained those apprehended within the interior under § 1226(a). These individuals detained in the interior enjoy greater due process protections, including the right to seek a bond hearing. This interpretation is intuitive. Those who have just arrived at the border seeking admission are subject to mandatory detention without the opportunity for bond because they lack the same constitutional protections as those already settled within the interior.

DHS changed course in 2025 by concluding that all noncitizens who entered the country without being inspected by an immigration officer are subject to mandatory detention under § 1225(b)(2). Doc. 15 at 10. This shift requires DHS to detain virtually all noncitizens, including Petitioner, who are present in the United States without being inspected when they first entered, regardless of the length of their residence, or any previous permission to live in the United States

granted by the government. *Id*. at 10–11.  This new interpretation expands the definition of "seeking admission" and "applicant for admission" beyond those at the border or ports of entry to include virtually all noncitizens in the interior who lack a formal inspection.

Respondents contend that "admission" under the INA is now contingent upon inspection by immigration authority rather than physical entry. *Id*. at 12.  Under this legal fiction, an individual who has lived in the United States for six years remains unadmitted under § 1225.  The individual is physically inside the country, but remains legally outside of it.  This outcome remains the same even if the length of residence spans decades.  DHS contends that this new approach is more loyal to the plain language of § 1225(b)(2).  Furthermore, Respondents argue that Congress could not have intended for mandatory detention to depend on the timing of when a noncitizen attempts to show admissibility.  Doc. 15 at 13.

The Board of Immigration Appeals ("BIA") adopted this new interpretation in *Matter of Yajure Hurtado*.  In that decision, the BIA held that an individual apprehended in the interior, even those with prolonged physical presence, remain an "applicant for admission" because they were never formally inspected and admitted.  Doc. 15 at 10.  *Yajure Hurtado* rejects the proposition that an individual ceases to be "seeking admission" because they have resided in the United States for a long period.  Doc. 15 at 11.

Determining which statute governs Petitioner's detention is critical.  While § 1225(b)(2) requires detention without bond, § 1226(a) provides for a discretionary bond hearing.  Consistent with DHS's current policy, immigration judges nationwide are refusing to conduct bond hearings for those designated as "applicant for admission" under § 1225(b)(2).  Doc. 1 ¶ 55. Petitioner's experience confirms this practice.  The immigration court twice denied his requests for bond citing a lack of jurisdiction to set bond for those in mandatory detention.  Doc. 1-5 at 2, 4.

      c. <u>Petitioner's Apprehension within the Interior Precludes Classification Under § 1225.</u>

Section 1226(a), rather than § 1225(b)(2), governs Petitioner's detention. The Court reaches this conclusion for the reasons set forth below.

First, the Court finds the plain meaning of "seeking admission" and "applicant for admission" does not encompass Petitioner's current circumstances. This Order does not attempt to settle the broader statutory interpretation issues that have sparked heated debate and conflicting rulings across the districts. Rather, the Court limits its holding to the specific facts of this case, finding that § 1225(b)(2) is inapplicable to the specific circumstances of this Petitioner.

Section 1225(a)(1) defines an "applicant for admission" to the United States as "[a]n alien present in the United States who has not been admitted or who arrives in the United States." The government detains Petitioner on the ground that, because he is present in the United States without an inspection, he is an applicant for admission subject to mandatory detention under § 1225(b)(2)(A). Doc. 15 at 12.

In other words, to trigger mandatory detention under this provision, three things must be true. The alien must be: "(1) an applicant for admission, (2) seeking admission, and (3) not clearly and beyond a doubt entitled to be admitted." *See Gimenez Rivero v. Mina*, No. 6:26-cv-66, 2026 WL 199319, at *7 (M.D. Fla. Jan. 26, 2026); *see also Kashranov v. Jamison*, No. 2:25-CV-5555, 2025 WL 3188399, at *6 (E.D. Pa. Nov. 14, 2025).

Respondents contend that "applicant for admission" is synonymous with "seeking admission." *See* Doc. 15 at 12 n.4. Under this interpretation, any individual classified as an "applicant for admission" is necessarily "seeking such admission," thereby falling squarely under the scope of § 1225(b)(2)(A) and triggering mandatory detention. *See id*. The Court is not persuaded by this interpretation. Even assuming Petitioner meets the definition of an "applicant

for admission" under the DHS's new interpretation, he was not "an alien seeking admission" at the time of his detention. *See Kashranov*, 2025 WL 3188399, at *6 ("While [the petitioner] is an applicant for admission, he is not seeking admission. He's already here.").

The plain language of § 1225 does not support Respondents' interpretation. The phrase "seeking admission" appears three times within § 1225, consistently in conjunction with the term "applicant for admission." First, § 1225 (a)(3) provides that

> [a]ll aliens (including alien crewman) who are *applicants for admission* or otherwise *seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers.

(emphasis added).

Second, § 1225(a)(5) provides that

> [a]n *applicant for admission* may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in *seeking admission* to the United States . . .

(emphasis added).

Finally, and most pertinent to the present inquiry, § 1225(b)(2)(A) provides that

> in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

(emphasis added).

Respondents contend that "one who is 'applying for something is necessarily seeking it,'" claiming that "applicant for admission" is the same as someone who is "seeking admission." *See* Doc. 15 at 12 n.4. However, if Respondents were correct, these three sections would be internally redundant, merely repeating the same requirement twice in the same sentence. A variation in terms suggests a variation in meaning. *Buenrostro-Mendez v. Bondi*, No. 25-20496, slip op. at 26 (5th

8

Cir. Feb. 6, 2026) (Douglas, J., dissenting).  Within the context of § 1225, it is illogical to use the terms "applicant for admission" and "seeking admission" interchangeably.

Moreover, despite the conclusions of some other courts, the interpretations of §§ 1225(b)(1) and (b)(2) simply cannot coexist with the Supreme Court's analysis in *Jenings* without significant logical strain.  As the Supreme Court observed in *Jennings*:

> In sum, U.S. immigration law authorizes the Government to detain certain aliens *seeking admission into the country* under §§ 1225(b)(1) and (b)(2).  It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c).

*Jennings*, 583 U.S. at 289 (emphasis added).

*Jennings* made clear that aliens "already in the country" are governed by §§ 1226(a) and (c).  While the Court may choose to revisit or overrule that portion of the decision, the existing language in *Jennings* unambiguously leads to the following three conclusions.  First, aliens "seeking admission" into the country are different from aliens "already in the country."  Second, §§ 1225(b)(1) and (b)(2) primarily apply to people seeking to enter the country, while §§ 1226(a) and (c) primarily apply to people who are already in the country.  Third, "seeking admission into the country" refers to the physical act of trying to cross into U.S. territory.  It does not refer to a legal and theoretical admission for those who are already corporally in the country but legally are not.  While the language of an opinion should not be always to be parsed like the language of a statute, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979), the above referenced paragraph in *Jennings* requires no such overreading.  It simply means what it says.

Next, the Court hesitates to interpret § 1225 in a way that renders § 1226 partially superfluous.  Section 1226(c)(1) serves as § 1226's own mandatory detention provision, listing criminal and terrorism offenses that render noncitizens otherwise covered by § 1226 subject to mandatory detention.  Congress expanded that list last year through the Laken Riley Act, which

9

added offenses like theft and assault of a law enforcement officer. Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at § 1226(c)(1)(E)); *see also Buenrostro-Mendez*, slip op. 28 (Douglas, J., dissenting). This recent legislation, along with a bulk of § 1226 would be rendered unnecessary if Respondents' interpretation were correct. Congress would not have gone through the trouble of adding more crimes that trigger mandatory detention if § 1225(b)(2)(A) already requires detention for that same population.

Accordingly, the Court finds that Petitioner is not subject to the mandatory detention under § 1225(b)(2)(A). The Court follows Supreme Court precedent and adopts a reading that preserves the meaning of §§ 1225 and 1226 rather than rendering them redundant.

### III. The Court Finds *Maldonado Bautista* Persuasive but Does Not Adopt It as Binding Precedent.

Petitioner alleges that he is an eligible member in the class certified in *Maldonado Bautista v. Santacruz*. Doc. 1 ¶ 121. The judgment in *Bautista* declared that eligible class members are detained under § 1226(a), rather than the mandatory provisions of § 1225(b)(2). *Id*. ¶ 122. Accordingly, these individuals are entitled to an individualized assessment for release by immigration officers and, if they remain detained, a custody redetermination hearing before an immigration judge. *Id*., citing *Maldonado Bautista v. Santacruz*, 25-cv-01873, 2025 WL 3289861 (C.D. Cal. Dec. 18, 2025). In response, Respondents rely on a territorial theory to argue that *Bautista*, a judgment by a California District Court, does not bind this Court. *See* Doc. 15 at 16 n.5.

While the Court finds *Bautista* persuasive, it believes declaring the decision binding is premature given the current splits among districts and ongoing procedural uncertainties. As detailed in the preceding section, the Court reaches its conclusion through an independent statutory analysis.

**IV.    Due Process violation**

The Court finds that the detention violates Petitioner's Fifth Amendment due process because he has a protected liberty interest in remaining free from detention and was deprived of that interest without constitutionally adequate process.  Courts analyze due process claims in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution.  *Garcia Domingo*, 2025 WL 2941217, at *3 (citing *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

Petitioner holds a protected liberty interest.  *See Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").  Because he spent six years at liberty in the United States prior to his arrest, Petitioner possesses a cognizable interest in his freedom from detention.  Remaining out of custody enabled him to do a "wide range of things," including to live at home, work, and "form the other enduring attachments of normal life."  *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).  Petitioner has developed deep roots in Shelton, Washington, alongside his family.  *See* Doc. 1-3 at 5.  Since June 13, 2015, he has maintained valid work authorization—issued by the same DHS that now detains him—that does not expire until 2030.  *See* Doc. 1-3 at 18.  Furthermore, Petitioner has established relationships with individuals in Shelton who have known him for years and are willing to vouch for his character.  His employer, in particular, confirms his work ethic and has expressed a willingness to re-hire him.  *See* Doc. 1-3 at 17.

This is not a case in which Petitioner evaded immigration authorities and remained lurking undetected in the United States until his recent detention.  On the contrary, Petitioner has interacted

11

with the government over the course of his six-year residence in the country. He first entered the United States in 2019 as an unaccompanied child and was processed and released by the Office of Refugee Resettlement into a sponsor. Doc. 1 ¶ 67. In addition, he applied for and obtained a valid employment authorization document on June 13, 2025, only months before his arrest. Doc. 1-3 at 18.

According to Form I-213, Petitioner "first came to the attention" of Seattle Enforcement and Removal Operations ("ERO") on July 28, 2020, "following his arrest by Shelton Police Department for minor in possession." *See* Doc 15-2 at 2. Petitioner entered a stipulated order of continuance, and the charge was dismissed with prejudice after he complied with conditions of the order. *Id.* ¶ 68. These records indicate that the government was aware of Petitioner's presence for years yet chose not to detain him. Respondents offer no explanation for this delay in enforcement, indicating that they only moved to detain Petitioner after a change in policy led them to revisit long-dormant records.

The Court finds Petitioner's arrest and detention violate the due process safeguards to which he is entitled to. The United State's power to admit or exclude aliens is no longer plenary once an alien enters the country, because the Due Process Clause applies to "all persons." *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("Once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

As early as 1886, the Supreme Court held:

> The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race,

of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

*Yick Wo v. Hopkins*, 118 U.S.356, 369 (1886).

The promise remains true today. Petitioner possesses a protected liberty interest in remaining free from detention and was deprived of that interest without constitutionally adequate process.

**V.     The Court Need Not Reach the Warrant's Procedural Validity.**

Having concluded that Petitioner's continued detention violates the Fifth Amendment, the Court need not address the legality of the administrative warrant or the procedural appropriateness of the arrest. The Court therefore reserves judgment on whether the agents' actions amounted to an unreasonable search and seizure, as the Due Process violation alone is sufficient to grant the requested relief.

Indeed, the circumstances surrounding the administrative warrant are dubious. The warrant is dated October 8, 2025, the same day the Petitioner was detained, but contains no time stamp. *See* Doc 15-1. According to Form I-213, agents began surveilling Petitioner at approximately 5:30 a.m. and apprehended him at around 6:30 a.m. *See* Doc. 15-2 at 2. While it seems unlikely that the warrant was executed between midnight and the operation, it is not impossible. A procedural deficiency has not been definitely established, even though the timeline raises doubts regarding the warrant's validity. Regardless, the Court need not reach the merits of this argument as the Petitioner is already subject to immediate release.

## CONCLUSION

**IT IS ORDERED** that:

1. The Verified Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. 1) is **GRANTED**.

2. Respondents shall release Petitioner within 24 hours of this Order.

3. Respondents shall coordinate Petitioner's release from the detention facility by notifying Petitioner's counsel when and where he can be collected, and by providing all necessary identity and travel documents to facilitate his return to Washington.

4. Respondents shall notify the Court of compliance within 48 hours of release by filing a Notice that contains the relevant date, time, and manner of release.

5. Respondents are enjoined from re-detaining Petitioner without first providing Petitioner with timely notice and a meaningful opportunity to be heard, pursuant to 8 U.S.C. § 1226.

6. The Motion for a Restraining Order (Doc. 2) is **DENIED AS MOOT**.

7. The Clerk of Court shall enter judgment accordingly and close this case.

**IT IS SO ORDERED**.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**